Joshua M. Ernst (#029855)
Ernst, Brown & Draper, PLLC
1930 S. Alma School Road
Suite A200
Mesa, AZ 85210
Telephone: 602-324-9673
JErnst@ebdlawyers.com
*Counsel for Plaintiff John Doe*

Susan C. Stone
Kristina W. Supler
Dayna M. Hloska
Anna E. Bullock
Kohrman Jackson & Krantz, LLP
1375 E. 9th Street, 29th Floor
Cleveland, OH 44114
Telephone: (216) 696-8700
scs@kjk.com; kws@kjk.com;
dmh@kjk.com; aeb@kjk.com
*Counsel for Plaintiff John Doe*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| John Doe,<br><br>Plaintiff,<br><br>v.<br><br>Arizona Board of Regents, governing body of Arizona State University, an agent of the State of Arizona; Dr. Joanne Vogel; and Jodi Preudhomme,<br><br>Defendants. | No. 2:24-cv-01829-SMB<br><br>**AMENDED COMPLAINT**<br><br>**(JURY TRIAL REQUESTED)** |

Plaintiff John Doe[1] ("John") for his Amended Complaint against Defendants Arizona Board of Regents ("ABOR"), Dr. Joanne Vogel and Jodi Preudhomme alleges as follows:

## INTRODUCTION

1. This action is brought on behalf of John, who was wrongfully suspended from Arizona State University ("ASU") on June 10, 2024.

2. The decision to suspend John was made after Jane Roe ("Jane"), John's former friend and fellow ASU student, was permitted to file an additional appeal in

[1] Consistent with this Court's Order (Doc. No. 29) Plaintiff John Doe and ASU student Jane Roe are identified through the use of pseudonyms. Additionally, this Amended Complaint is filed pursuant to this Court's Order (Doc. 30).

contravention of ASU's policies and procedures, contesting two previous findings that John was not responsible for Title IX sexual harassment.

3. John now seeks relief against Defendants following ASU's and Defendants' discriminatory treatment and unlawful suspension of him following a Title IX appeal process flawed by a flagrant conflict of interest, sex and gender bias; and which had a predetermined outcome due to pressures placed on ASU by Jane and others to find in favor of female students.

4. Unless overturned, ASU's discipline and sanction will remain part of John's education records and will substantially limit his ability to complete his undergraduate education, attend graduate school, and/or secure future employment.

5. John is seeking declaratory and injunctive relief vacating John's suspension, expunging all findings of responsibility and sanctions from John's record, correcting John's records, and awarding John monetary damages.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction (i) under 28 U.S.C. §§ 1331 and 1334 because this action arises, in part, under the laws of the United States — including 20 U.S.C. § 1681 *et seq.* and 42 U.S.C. § 1983, and (ii) under the principles of supplemental jurisdiction under 27 U.S.C. § 1367.

7. This Court has personal jurisdiction over the Defendants ABOR, Dr. Joanne Vogel and Ms. Jodi Preudhomme because they are residents of Arizona and their actions or omissions that are the subject of this matter took place in this District.

8. This Court is authorized to grant the declaratory relief sought under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

9. Venue is proper in this District under 28 U.S.C. § 1391 because the acts or omissions giving rise to this matter occurred within this District.

## THE PARTIES

10. John is a natural person who is a United States citizen currently residing in Paradise Valley, AZ.

11. Defendant ABOR is the governing body for ASU. It is sued in its official capacity and may be sued under A.R.S. § 15-1625.

12. Defendant Dr. Joanne Vogel is the Vice President of Student Services for ASU. Dr. Vogel is sued in her official capacity and individual capacity.

13. Defendant Ms. Jodi Preudhomme is the Title IX Coordinator and Special Counsel for ASU. Ms. Preudhomme is sued in her official capacity as Title IX Coordinator and in her individual capacity.

## STATEMENT OF FACTS

**John and Jane's Relationship Prior to August 20, 2021**

14. John and Jane met at a birthday party in the summer of 2021.

15. About two weeks after meeting, John asked Jane out on a date.

16. Although the date went well, John determined he was not interested in pursuing a romantic relationship with Jane.

17. John and Jane continued to communicate with each other via social media and text messages after the date.

18. In early August 2021, Jane asked John to go out clubbing with her and her friends.

19. John agreed to go since John and Jane would be with a group of other people.

20. John left the club early with another friend.

21. After John left, Jane texted John asking where he was and asking him to come to her residence so that they could "sleep together."

22. John's friend drove John back to Jane's residence.

23. While at Jane's residence, John and Jane proceeded to kiss and touch each other sexually over clothing.

24. Jane indicated to John that she did not want to go any further sexually and John respected her wishes.

25. Two days later, Jane invited John to her parent's home to meet them and some of her other friends.

26. John questioned whether the invitation to meet Jane's parents was an indication she wanted to pursue a romantic relationship with him.

27. John told Jane that he was not looking for anything serious because he was planning to leave Arizona for a year to travel.

28. Jane understood John did not want to pursue an official dating relationship with her, and they mutually agreed to be "friends with benefits."

29. Jane and John saw each other three more times within the week of him meeting her parents, and they continued to mutually kiss each other and touch each other sexually over clothing when they saw each other.

**The Events of August 20th and August 21, 2021**

30. The night of August 20, 2021, John went to a birthday party for a friend.

31. At the party, John consumed beer, took shots of hard liquor, and had mixed drinks.

32. John also smoked marijuana.

33. John had not eaten that day and soon became very intoxicated.

34. Jane texted John throughout the night and said she was coming to the same party.

35. Jane told John she wanted to make out with him at the party.

36. When Jane arrived at the party, John could not spend time with her because he was sick and throwing up in a bathroom.

37. Another friend of John's also became sick, and he and John headed to another bathroom in someone's room.

38. Jane continued to text John and ask where he had gone.

39. John texted Jane to advise her he was in a bathroom because he was not feeling well.

40. Jane eventually came to the room adjacent to the bathroom John and his friend were using.

41. John and Jane consensually kissed and touched each other over clothing on the bed in the room with others present.

42. At some point, Jane asked John to leave the party and go back to her residence.

43. John declined Jane's invitation to take care of his friend.

44. John eventually left the party with his friend, and they took an Uber back to his friend's apartment.

45. John fell asleep at his friend's apartment for a period of time, but woke up around 2:00 a.m. on August 21, 2021.

46. John felt tired and very intoxicated when he woke up.

47. As John was trying to fall back asleep, he checked his phone and saw numerous text messages from Jane.

48. John texted Jane back, and she replied that she wanted to see him and make out with him.

49. John asked what Jane would be open to sexually, specifically whether she would be interested in oral sex, digital penetration, or sexual intercourse.

50. Jane said "no" to sexual intercourse and John performing oral sex on her.

51. Jane said "maybe" to performing oral sex on John and being digitally penetrated.

52. Jane eventually drove to John's friend's apartment to pick him up.

53. Jane was sober at the time.

54. Jane picked John up wearing a hoodie and swimsuit bottom.

55. After picking up John, Jane drove to the Vista del Sol parking lot, which is on ASU's campus.

56. John and Jane began consensually kissing in the parking lot and eventually made the mutual decision to make their way to the backseat of Jane's car.

57. John told Jane he was very intoxicated, and she questioned whether or not to proceed with sexual contact.

58. Jane ultimately decided to continue.

59. John asked Jane if she would perform oral sex on him, and she responded again with "maybe."

60. John then asked Jane if he could touch her clitoris, and she said yes.

61. John attempted to touch Jane's clitoris over her swimsuit bottom but was having difficulty.

62. John asked to remove Jane's swimsuit bottom, and she declined.

63. John respected Jane's wishes and continued to touch her clitoris over her swimsuit bottom.

64. Jane began nodding her head "yes" and moaning.

65. Jane has never denied that she was nodding her head "yes" and moaning.

66. John understood Jane's head nodding yes and moaning to be consent to the sexual activity that was occurring.

67. After some time had passed, John moved Jane's swimsuit bottom to the side and began rubbing Jane's clitoris underneath her clothing.

68. Jane continued to nod her head "yes" and moan.

69. After some more time had passed, John then slowly moved his hands to the area of Jane's vagina and digitally penetrated her.

70. Jane continued to nod her head "yes" and moan while John digitally penetrated her.

71. After approximately five minutes, Jane pushed John's hand away from her vagina, John understood that to mean Jane wanted to stop.

72. The digital penetration ceased immediately when Jane indicated via her nonverbal communication she wanted to stop.

73. John then asked Jane again if she would perform oral sex on him. She consented.

74. Jane proceeded to perform oral sex on John until she noticed he was falling in and out of sleep/passing out.

75. Jane moved back to the driver's seat and asked John if he wanted to get in the passenger seat to drive back to her residence.

76. John was unable to get into the passenger seat because he was tired and intoxicated.

77. Jane drove John back to her apartment in Tempe because John lived at home with his parents.

78. John fell asleep on Jane's couch.

79. Around 7:00 a.m., Jane woke up John and asked him to come sleep in her bed.

80. John went to Jane's room where they proceeded to cuddle and sleep until around 11:00 a.m.

**The Events After August 21, 2021**

81. For the next week, John and Jane continued to discuss their consensual encounter and how they respected each other for listening to the needs and wants of the other.

82. Jane's text messages to John acknowledged she consented and had fun with John on August 21, 2021 and indicated that John made sure she stayed within boundaries she was comfortable with.

83. Some of Jane's texts to John during this time demonstrating her ratification of consent to the sexual encounter include the following:

a. "i did [have fun] but i think, its more complicated than that."

b. "like ive j been feeling rly guilty i guess bc wtf is my self control recently."

c. "but yeah I had fun like it was good, and i def tried to make sure i stayed wi boundaries I was comft w."

d. "and obv its not like inDIDNT [sic] want to…"

e. "I j feel rly bad still that u were that drunk so when u make jokes about it I cant tell LMAO im like I SWEAR I DIDN'T MEANT TO RAPE YOU BRO."

84. These text messages are starkly different from and contradict the allegations Jane later asserted in her formal Title IX complaint that she filed with ASU.

85. Jane then began to feel guilty and regret their consensual encounter and demanded John accept full responsibility for what had occurred.

86. Despite this change of heart, Jane remained open to being friends with John and doing things sexually during this time.

87. Jane even sent John a text message asking: “u mean u dont wanna be friends at all [?]” and “what if we took space n tried to hang as friends eventually [?]”

88. John eventually grew tired of talking about the sexual encounter, and he ended the friendship.

89. Jane was hurt and upset when John ended the friendship.

90. Jane started overwhelming John by sending him numerous text messages.

91. Jane sent John up to nineteen (19) text messages in a row without John responding once.

92. On August 29, 2021, Jane began to threaten John via text message that she would report him to the police or ASU if he did not talk to her or hang out with her.

93. Jane also threatened John that she would have her brother or her male friends physically assault him on ASU’s campus.

94. John was so terrified of Jane that he began wearing a large mask between classes to prevent people from identifying him, and he blocked Jane.

95. On August 29, 2021, after John blocked Jane, Jane for the first time accused John of sexually assaulting her. She did so on her Instagram story.

96. John was shocked by this allegation, as Jane had never accused him of sexual assault during any of their discussions.

97. John ultimately reported Jane’s conduct, including how she sexually assaulted him, to ASU and the police.

98. Jane posted John’s name on Instagram and again claimed that John sexually assaulted her.

99. Jane also contacted a friend of John's sister and asked her to arrange a meeting between Jane and John's sister to discuss John.

100. John's sister did not meet with Jane.

101. John requested that ASU issue a non-contact directive due to Jane's ongoing harassment.

102. On September 23, 2021, ASU issued a no-contact directive at John's request precluding John and Jane from having contact with each other.

103. On September 24, 2021, Jane broke the no-contact directive and reached out to one of John's friends inquiring about him.

104. On October 4, 2021, Jane again made a full post on Instagram accusing John of sexually assaulting her. That post included a picture of John and his name.

105. On October 28, 2021, Jane posted on Instagram that she missed John but also accused him of sexually assaulting her.

106. John reported Jane's ongoing harassing conduct to ASU.

107. ASU adjudicated John's complaints via Defendant ABOR and ASU's Student Code of Conduct, but ultimately found Jane not responsible and took no disciplinary action against her because she was female.

108. ASU also never pursued a sexual misconduct charge against Jane because she was female.

**ASU's Policy and Procedures**

109. ASU's Title IX process is governed by ACD 401: Prohibition Against Discrimination, Harassment, and Retaliation ("Policy") and the Interim Grievance Process for Formal Complaints of Title IX Sexual Harassment ("Procedures"). The Policy is attached hereto as Exhibit A and the Procedures are attached hereto as Exhibit B.

110. The Policy provides that ASU is "committed to providing an environment free of discrimination, harassment, or retaliation for the entire university community, including students…" and that it "expressly prohibits discrimination, harassment, and

retaliation by employees, students, contractors, or agents of the university based on any protected status:…sex…gender identity…and Title IX sexual harassment."

111. The Policy provides that providing false or misleading information or failure to cooperate in a matter may result in disciplinary action.

112. The Policy also provides that "retaliation occurs when an adverse action…is taken against an individual for complying with this [P]olicy, opposing conduct reasonably believed to constitute a violation of this [P]olicy, filing a report under this [P]olicy, seeking an accommodation under this [P]olicy, or participating in any manner in an investigation or proceedings related to this [P]olicy."

113. Adverse actions that are reasonably likely to deter a complaining individual or others from engaging in protected activity are likewise prohibited by the Policy.

114. The Policy and Procedures establish that the Procedures are the exclusive process for the investigation and adjudication of formal complaints of Title IX sexual harassment.

115. The Policy and Procedures purportedly provide for "prompt and equitable methods of investigation and resolution to stop discrimination, remedy any harm, and prevent its recurrence."

116. The Policy and Procedures define Title IX sexual harassment as conduct, based on sex, that constitutes one or more of the following:

a. Unwelcome conduct, occurring in the United States, that a reasonable person would find so severe, pervasive, and objectively offensive that it effectively denies a person equal access to ASU's education programs or activity;

b. An employee conditioning the provision of an aid, benefit, or services of ASU on an individual's participation in unwelcome sexual conduct; and

c. Any of the following specific acts of sexual harassment taking place within the United States and within an ASU education program or activity: sexual assault, dating violence, domestic violence, and stalking.

117. The Procedures define "consent" to sexual activity in pertinent part as "informed and freely given words or actions that indicate a willingness to participate in mutually agreed upon sexual activity."

118. After a formal complaint of Title IX sexual harassment is filed, the Procedures provide that the matter is assigned to an investigator who issues the notice of allegations to the parties, conducts a neutral fact-finding investigation allowing both parties equal opportunity to present witnesses and evidence, and creates an investigation report that fairly summarizes the evidence.

119. The parties are allowed to respond in writing the investigation report before it is finalized.

120. Once the investigation report is finalized, the matter is assigned to a Hearing Officer and scheduled for a live hearing.

121. The Procedures prohibit Hearing Officers and Decision Makers from having a conflict of interest or bias for or against complainants or respondents generally or specifically concerning an individual complainant or respondent.

122. At the live hearing, each party is provided an equal opportunity to present witnesses and evidence and to cross-examine the other party and any witnesses through their advisors.

123. Following the hearing, the Hearing Officer is tasked with issuing a written determination that includes all of the following information:

a. A description of the procedural steps taken from the receipt of the formal complaint through the determination, including any notifications to the parties, interviews with the parties and witnesses, site visits, methods used to gather other evidence, and hearings held;

b. A statement of the standard of evidence being used (preponderance of the evidence) and that the burden of proof and gathering and presenting sufficient evidence to reach a determination regarding responsibility rests with ASU;

c. Identification of the allegations potentially constituting Title IX sexual harassment;

d. Findings of fact;

e. Conclusions regarding the application of the alleged violations to the facts;

f. A statement of, and rationale for a determination of responsibility, including a rationale for disciplinary sanctions;

g. A statement whether remedies designed to restore or preserve equal access to ASU's education program or activity will be provided to the complainant; and

h. A statement that the parties are entitled to appeal the determination regarding responsibility and a notice of appeal rights.

124. There is no requirement in the Policy or Procedures that a Hearing Officer must include credibility assessments in a written determination.

125. Either party may appeal the written determination of the Hearing Officer on the narrow basis of (a) procedural irregularity; (b) new evidence that was not reasonably available at the time of the determination regarding responsibility or dismissal determination was made, that could affect the outcome of the matter; (c) excessive severity of the sanction; (d) the decision was not reasonably justified by the evidence or was contrary to law; or (e) the Title IX Coordinator, investigator(s), Hearing Officer or Decision Maker(s) had a conflict of interest or bias for or against complainants or respondents generally or the individual complainant or respondent that affected the outcome of the matter.

126. Disagreement with the Hearing Officer's decision is not a permissible basis for appeal.

127. A party cannot object to the individual designated to serve as the Appeal Decision Maker.

128. Although the non-appealing party receives a copy of any appeal filed, the non-appealing party cannot respond to the arguments raised in it.

129. The Appeal Decision Maker must issue a written determination and can uphold or modify the previous decision or grant rehearing.

130. The decision by the Appeal Decision Maker is the final decision and cannot be appealed pursuant to the Procedures.

**John's Title IX Process at ASU**

131. On September 28, 2021, in retaliation for John seeking a no-contact directive, Jane filed a formal Title IX complaint with Jodi Preudhomme against John at ASU.

132. ASU failed to categorize Jane's filing of a complaint against John after he requested a no-contact directive as retaliation because she was female and John had filed a complaint that Jane was harassing him first.

133. If the roles were reversed, and Jane, a female, had filed a complaint first, ASU would not have hesitated to consider any complaint filed by John, a male, as retaliation.

134. Ms. Preudhomme, as the Title IX Coordinator, is responsible for the oversight, implementation, and coordination of Title IX at ASU.

135. Jane's formal Title IX complaint alleged that on August 21, 2021 John digitally penetrated her vagina without consent and that he attempted to penetrate her vagina with his penis but was unsuccessful.

136. This was the first time Jane alleged that John attempted to penetrate her vagina with his penis.

137. The investigation was assigned to ASU's Office of Student Rights and Responsibilities ("SRR") via Ms. Preudhomme.

138. Ms. Elizabeth Ojeda served as the investigator.

139. Neither John nor Jane objected to Ms. Ojeda serving as the investigator.

140. Ms. Ojeda interviewed the parties in September and October 2021, but took no further action related to the investigation before the start of 2022.

141. Although John provided a list of witnesses to Ms. Ojeda during the investigation, none of John's witnesses were interviewed.

142. Jane's formal Title IX complaint was subsequently dismissed by Ms. Preudhomme on January 12, 2022 because John was no longer an enrolled student.

143. John eventually re-enrolled at ASU.

144. Jane's formal Title IX complaint was re-opened by Ms. Preudhomme on March 13, 2023 after Jane contacted SRR and advised that John had returned to ASU as a student.

145. Ms. Ojeda was selected to continue serving as the investigator.

146. Neither John nor Jane objected to Ms. Ojeda continuing to serve as the investigator.

147. Ms. Ojeda interviewed the parties again in March 2023.

148. Jane's interview was delayed because she failed to appear for scheduled meetings with Ms. Ojeda.

149. In April 2023, Jane requested an extension of time to submit additional documentation until her finals were completed and ASU granted her request.

150. In May 2023, the parties were given access to the Evidence File and provided the opportunity to respond.

151. In June 2023, Jane advised ASU she was out of the country until July 1, 2023.

152. In July 2023, the parties were given access to the Evidence File again and provided the opportunity to respond.

153. On July 6, 2023, Jane's advisor, a nationally renowned female victim's rights advisor, contacted Ms. Ojeda and advised she would be serving as Jane's advisor.

154. Jane and her advisor then attempted to further delay the process by suggesting revisions to a non-disclosure agreement the parties had already executed, requesting irrelevant documentation, and claiming the Evidence File was missing information.

155. The tactics employed by Jane and her advisor resulted in the Evidence File undergoing an independent review by Megan Thompson, Associate Director of SRR.

156. Upon information and belief, Ms. Thompson determined that the Evidence File was not missing any information.

157. On July 20, 2023, Jane responded to the Evidence File.

158. As part of Jane's response, she threatened ASU with a disability discrimination claim unless it agreed to redact certain information.

159. In September 2023, the parties were given access to the Evidence File for a third time and provided the opportunity to respond.

160. Jane requested an extension of time to respond, which ASU granted.

161. On September 15, 2023, Jane submitted her response to the third Evidence File.

162. Jane's response claimed for the first time that Ms. Ojeda was biased against her because she investigated John's complaint brought under the Student Code of Conduct against Jane and that she was aware of John's intention to re-enroll at ASU at the time the formal Title IX complaint was dismissed.

163. Jane's response also threatened legal action against ASU for alleged violation of her Title IX and Clery Act rights.

164. Ms. Ojeda prepared a draft investigation report and provided it to the parties in October 2023.

165. Jane requested an extension of time to respond to the draft investigation report, which ASU granted.

166. On November 13, 2023, Jane submitted her response to the draft investigation report.

167. Jane made numerous demands as part of her response, including demanding: (a) ASU remove Ms. Ojeda as the investigator because of bias against her; (b) ASU confirm in writing that Ms. Thompson was not involved in John's sexual assault complaint against Jane; (c) Jane's allegation of John's attempted penetration of her vagina with her penis be included in the allegations; (d) ASU issue an updated Title IX notice; and (e) ASU include information regarding whether an individualized safety and risk assessment was conducted regarding John before permitting his re-enrollment.

168. The Notice of Hearing and Charges was issued on December 20, 2023, setting the hearing for January 9, 2024 and identifying Dr. Cassandra Aska, Deputy Vice President of Student Services at ASU as the Hearing Officer.

169. Neither John, nor Jane objected to Dr. Aska serving as the Hearing Officer.

170. John was charged with Title IX sexual harassment as defined in the Policy and Procedures.

171. John requested that the hearing be delayed by one week because he had obtained a new advisor and needed time to prepare. ASU declined to change the hearing date.

172. The hearing went forward on January 9, 2024 and was conducted according to the Procedures.

173. ASU had representatives from its Office of General Counsel present at the hearing to advise Dr. Aska and SRR and to ensure that the hearing proceeded in accordance with the Policy and Procedures.

174. John, Jane, and ASU were allowed to call witnesses and provide evidence at the hearing.

175. John and Jane through their respective advisors had the opportunity to cross-examine each party and witness.

176. The only witness testimony at the hearing was from Jane and John.

177. On January 30, 2024, Dr. Aska issued a Determination Regarding Responsibility finding that John's alleged conduct did not constitute Title IX Sexual Harassment.

178. Dr. Aska's Determination Regarding Responsibility contained all of the elements required by the Procedures.

179. Dr. Aska's determination also included the following conclusions after hearing the testimony at the live hearing and considering all evidence: (a) The parties did not dispute that John digitally penetrated Jane and that Jane did not give consent with words; (b) Jane admitted during the hearing that her prior expressed boundary of being unwilling

to engage in sexual activity involving her vagina changed and became ambiguous shortly before August 21, 2021; (c) Jane provided consent to John to place his hand inside her swimsuit bottom; and (d) Jane's actions of nodding her head and moaning could reasonably be construed by John as non-verbal consent to the digital penetration of her vagina.

180. Dr. Aska noted that after the digital penetration, Jane performed oral sex on John, drove him back to her apartment, invited him to sleep on the couch, and then later asked him to come to her bed and cuddle.

181. Dr. Aska found no evidence to suggest that John attempted to insert his penis into Jane's vagina.

182. Ultimately, Dr. Aska chose to believe John over Jane.

183. Dr. Aska had the benefit of hours of testimony and in person evaluation of the credibility of John and Jane to reach her determination.

184. Any appeal of Dr. Aska's determination was due by February 14, 2024 as outlined in the Procedures.

185. Jane requested an extension of time to appeal, which ASU granted.

186. On March 1, 2024, Jane advised ASU that she would pursue both Title IX and Clery Act claims–which carry a potential fine of $69,733 per each violation—against ASU for allegedly violating her rights during the process.

187. On March 27, 2024, Jane submitted her appeal (hereinafter "First Appeal") of Dr. Aska's determination claiming procedural irregularity, bias against her, and an unreasonable and unjustified determination.

188. Jane's First Appeal also included yet another threat against ASU that she would file Title IX and Clery Act complaints with the U.S. Department of Education's Office for Civil Rights ("OCR") and Clery Group.

189. Jane spent half of her First Appeal simply restating her testimony at the hearing and asserting that her version of events should have been adopted by Dr. Aska.

190. Jane attempted to hide that her First Appeal was really about her disagreement with Dr. Aska's decision, which is not a permissible ground for appeal under the Procedures.

191. Jane's procedural irregularity claims were that (a) ASU failed to amend the Notice of Allegations to include all of her allegations against John and correct the penile penetration allegation from completed to attempted; (b) ASU did not apply the Title IX definition of sexual harassment; (c) ASU did not make the required credibility determinations; and (d) ASU failed to apply the preponderance of the evidence standard.

192. Jane's bias claims were that (a) ASU should have hired a neutral outside investigation because John's father is employed by ASU; (b) ASU minimized the available Title IX charges against John creating a biased adjudication; (c) ASU failed to correct an error in the Notice of Allegations that wrongfully imputed credibility issues to her; (d) ASU ignored repeated testimony between 2021 and 2024 when reaching a determination; and (e) ASU changed its Policy definition of consent to require her resistance.

193. Jane's final claims were that ASU's findings of fact and conclusions were not reasonable or justified.

194. John had no opportunity to respond to Jane's First Appeal.

195. Defendant Dr. Vogel was designated as the Appeal Decision Maker.

196. As outlined below, Dr. Vogel possessed a conflict of interest and bias for Jane and female complainants generally.

197. John was not notified of Dr. Vogel's designation as the Appeal Decision Maker before Jane appealed and had no opportunity to object to her serving in the role.

198. On April 10, 2024, Dr. Vogel issued her determination granting Jane's First Appeal on the grounds of procedural irregularity affecting the outcome, namely that there were no credibility determinations identified in Dr. Aska's determination.

199. Dr. Vogel found no bias against Jane in favor of John.

200. Dr. Vogel remanded the matter to Dr. Aska for review/rehearing.

201. On April 11, 2023, Jane sent an email to Dr. Vogel requesting there not be a rehearing.

202. Jane did not want John to have the opportunity to testify again and respond to the arguments raised in her appeal.

203. On April 18, 2024, Dr. Vogel sent a letter to Jane clarifying her decision.

204. Dr. Vogel confirmed she did not determine that an outside adjudicator was warranted.

205. Dr. Vogel also confirmed it was Dr. Aska's decision whether she had adequate information from the current record to issue an amended determination or if she believed the matter required a rehearing.

206. On April 19, 2024, Dr. Aska determined that a rehearing was not necessary for her to issue an amended determination.

207. On April 19, 2024, Jane again threatened ASU with a complaint to the U.S. Department of Education for violation of her rights.

208. On May 6, 2024, Dr. Aska issued her Amended Determination Regarding Responsibility once again finding that John's alleged conduct did not constitute Title IX Sexual Harassment.

209. Dr. Aska did not materially alter her findings of fact; however, she did add additional factual findings and included citations to the record in support of each of her findings.

210. Dr. Aska included credibility determinations as directed by Dr. Vogel in finding that John's account of the interactions remained largely consistent, while Jane's account changed in significant ways.

211. Specifically, Dr. Aska found that Jane's text messages with John following the alleged incident demonstrated that she believed that "he bore no fault for what had happened."

212. In other text messages, Jane suggested that she willingly participated in the sexual encounter.

213. Dr. Aska found that Jane's text messages with John differed from and contradicted her current allegations against him.

214. Dr. Aska also found that Jane did not view the sexual encounter as assault until after John unfriended her on social media on or around August 27, 2021.

215. Further, Dr. Aska noted that Jane's testimony regarding the alleged attempted penile penetration of her vagina changed dramatically and was contradictory.

216. Jane first alleged at the live hearing that John attempted to remove her swimsuit bottoms, attempted to penetrate her vagina with his penis, touched her clitoris, and then tried to digitally penetrate her.

217. Later during the live hearing, Jane claimed that John touched her clitoris, then attempted to penetrate her vagina with his penis, and then digitally penetrated her.

218. Dr. Aska also noted that none of Jane's text messages with John mention an alleged attempted penile penetration of her vagina.

219. Again, Dr. Aska chose to believe John over Jane.

220. Dr. Aska appropriately applied the preponderance of the evidence standard in making her findings.

221. Dr. Aska's credibility determinations are not a procedural matter.

222. The parties were wrongfully afforded until May 21, 2024 to appeal Dr. Aska's amended determination.

223. Upon information and belief, Dr. Aska in error included information pertaining to appeal rights in her amended determination as she probably cut and pasted information into a template.

224. This opportunity for a second appeal was in contravention of the Procedures, which provide that the decision by the Appeal Decision Maker is the final decision.

225. Thus, the remand for rehearing followed by the amended determination by Dr. Aska should have ended the process.

226. Jane requested an extension of time to file a second appeal, which was granted by ASU.

227. On May 23, 2024, Jane submitted her second appeal (hereinafter "Second Appeal") arguing the exact same grounds as her first appeal, including that ASU failed to apply the proper definition of consent to her matter.

228. Specifically, Jane argued that John needed verbal consent to digitally penetrate her vagina and that consent via actions and nonverbal cues was invalid.

229. Jane also argued that Dr. Aska's credibility determinations were wrong because John allegedly made contradictory statements that were ignored by Dr. Aska.

230. John had no opportunity to respond to Jane's Second Appeal.

231. Rather than assign the matter to a new Appeal Decision Maker, Dr. Vogel was again assigned to serve as the Appeal Decision Maker.

232. John was not notified that Dr. Vogel would decide the Second Appeal.

233. John had no opportunity to object to Dr. Vogal serving again as the Appeal Decision Maker.

234. On June 10, 2024, Dr. Vogel issued her decision concerning Jane's Second Appeal.

235. Upon on information and belief, Dr. Vogel evaluated the appeal by reviewing only paper and audio recordings.

236. Dr. Vogel was not the neutral decision-maker she was intended to be and guaranteed to be under the Policy and Procedures.

237. Dr. Vogel allowed Jane to direct the course of her decision-making to John's detriment.

238. Dr. Vogel's decision was just one page and did not address most of the grounds raised by Jane as part of her First Appeal.

239. Dr. Vogel improperly categorized Dr. Aska's credibility determinations as procedural errors.

240. Dr. Vogel should have given Dr. Aska's determination and credibility determinations greater deference because Dr. Aska presided over the live hearing and observed John's and Jane's testimony.

241. Instead, Dr. Vogel ignored Dr. Aska's rationale and determination entirely in order to make her own factual and credibility determination despite not having been present at the live hearing and not having heard the testimony from John and Jane.

242. Dr. Vogel undertook a rehearing herself rather than remanding for rehearing pursuant to the Procedures.

243. There is no indication that Dr. Vogel based her decision on anything other than a disagreement with Dr. Aska's determination and a desire to issue a finding in favor of a female complainant.

244. Dr. Vogel improperly found that consent to sexual activity required words in John's case and could not be established via actions in contravention of the Procedures.

245. Dr. Vogel allowed Jane to dictate the definition of consent to sexual activity as requiring only verbalization and words to indicate consent that she then used to guide her decision, and which did not comport with the definition of consent in the Procedures.

246. Dr. Vogel then without cause, justification, or the support of the evidence presented in the matter rendered a determination that John did not have consent to digitally penetrate Jane's vagina because he had not obtained verbalized consent from Jane and was thus responsible for violating the Policy.

247. Dr. Vogel sanctioned John with a one-year suspension.

248. While on suspension, John cannot be on ASU's campus.

249. Dr. Vogel's decision to overturn Dr. Aska without written input from John is fundamentally unfair.

250. Had John been found responsible by Dr. Aska, he would have at least been allowed to appeal on the grounds provided for in the Procedures. Here, there was no meaningful way for John to respond to Jane's First and Second Appeals.

251. John's exclusion from ASU's campus has resulted in him losing his paid lab research position at ASU.

252. If John returns to ASU following the suspension, he will be placed on probation until graduation.

253. Dr. Vogel's sanction of John also included a requirement that he complete training related to consent and meet with SRR to review his learning.

254. John had no mechanism available to appeal Dr. Vogel's decision despite Jane being permitted an appeal following the Appeal Decision Maker's decision under similar circumstances.

255. On July 8, 2024, ASU sent John a letter confirming Dr. Vogel's decision, reiterating the terms of his one-year suspension and confirming that a hold has been placed on his records.

**Dr. Vogel's Bias Against Males and Respondents**

256. As part of Dr. Vogel's duties as ASU's Vice President of Student Services in the Office of Educational Outreach and Student Services, Dr. Vogel is responsible for overseeing and implementing the Sexual and Relationship Violence Program ("SRVP"). See, https://eoss.asu.edu/srvp (last visited November 19, 2024).

257. The SRVP focuses on the prevention of violence and survivor support.

258. The SRVP's primary focus is supporting female alleged victims and survivors of sexual assault.

259. The SRVP maintains an active social media presence on various platforms, including Instagram. See, https://www.instagram.com/asusrvp/?locale=de&hl=am-et (last visited November 19, 2024).

260. The ASU students featured on SRVP's Instagram posts are solely female.

261. No male victims or survivors appear in SRVP's Instagram posts.

262. SRVP also promotes events and activities highlighting female victims and survivors including, Denim Day[2], the Clothesline Project[3], and Sexual Assault Awareness Month activities featuring events such as a screening of the 2022 film "Luckiest Girl Alive."

263. There are no promoted events and activities highlighting male victims and survivors.

264. On April 12, 2021, Dr. Vogel appeared on an episode of "Devils in the Details" to discuss sexual assault awareness and prevention. See, Sexual assault awareness and prevention: Devils in the Details: Arizona State University (ASU) - YouTube (last visited November 19, 2024).

265. Dr. Vogel's introduction at the start of the episode included her professional history, such as being a licensed mental health counselor, a qualified sex therapist, and a trained victim advocate. *Id*. at 0:44.

266. Dr. Vogel is described as having a long history as a victim advocate. *Id*. at 1:04.

267. Dr. Vogel's describes the beginning of her career working with youth in the foster care system and identifies that is where she started to consider what victims of sexual assault needed. *Id*. at 1:31.

268. After 10 years Dr. Vogel moved to a collegiate counseling environment where she centralized a health center, counseling center, and victim's advocacy center. *Id*. at 1:57.

269. Dr. Vogel finds this work on behalf of victims to be a "calling." *Id*. at 2:10.

---

[2] Denim Day began after a male accused of sexual assault in Italy claimed in his defense that the female victim wore very tight jeans, she had to help him remove them, and by removing the jeans it was no longer rape but consensual sex. This became known throughout Italy as the "jeans alibi." Enraged by the verdict, the women in the Italian Parliament protested by wearing jeans on the steps of the Supreme Court. The protest was picked up by international media and eventually spread to Los Angeles, CA. Inspired, Patti Occhiuzzo Giggans, Executive Director of Peace Over Violence, thought everyone should be wearing jeans to protest all of the myths about why women are raped. https://denimday.org/history (last visited November 20, 2024).

[3] The Clothesline Project is an American non-governmental organization created to bring awareness to the issue of violence against women. https://en.wikipedia.org/wiki/The_Clothesline_Project (last visited November 20, 2024).

270. Dr. Vogel has enjoyed looking at ways that "we can support, educate, prevent and then, when necessary, provide intervention support and care for those who've been victims of violence." *Id*. at 2:12.

271. Dr. Vogel then spends the rest of the episode speaking about the resources available to "victims" and "survivors," as well as reporting options.

272. Dr. Vogel never mentions any resources or options available to accused students or respondents.

273. On May 31, 2022, Dr. Vogel again appeared in a video discussing sexual assault prevention and support. Sexual assault prevention and support: Arizona State University (ASU) - YouTube (last visited November 19, 2024).

274. Dr. Vogel discusses education, as well as support and reporting resources available to victims.

275. The sexual assault prevention and support events depicted in the video, such as tabling and the Clothesline Project, include only female students.

276. The only time two male students are depicted is related to a discussion about sexual assault prevention education.

277. Dr. Vogel reiterates the commitment to highlighting the "importance of preventing and educating and providing support to victims of sexual violence." *Id*. at 0:19.

278. Dr. Vogel states that part of ASU's education for students is to train them on "how not to be somebody who commits an act of sexual violence." *Id*. at 1:25.

279. Yet, Dr. Vogel never mentions any resources or options available to accused students or respondents.

280. As outlined above, Dr. Vogel has condoned and demonstrated a clear preference for female alleged victims and survivors to the detriment of male respondents.

281. Dr. Vogel's background, training, and experience make it impossible for her to serve as a neutral decision-maker in Title IX matters concerning allegations of sexual misconduct against males.

282. By allowing Dr. Vogel to serve as the Appeal Decision Maker, ASU, and Defendants violated the Policy and Procedures because they did not provide John with a decision-maker free of conflict of interest or bias as promised.

**External Pressures on ASU**

283. External pressures on ASU pushed for a decision in Jane's favor to John's detriment.

284. Colleges and universities, such as ASU, risk losing federal financial assistance if they do not comply with Title IX.

285. This risk of loss presents substantial pressure to ASU as it receives millions of dollars each year in federal financial assistance.

286. Colleges and universities, such as ASU, are also under tremendous pressure from the U.S. Department of Education to act and appear tough on allegations of sexual misconduct.

287. ASU has a history of being under investigation by the U.S. Department of Education based on OCR complaints filed against it for alleged Title IX investigations. See, Two Chairs: Sexual assault on campus, told by Arizona State students | 12news.com (last visited November 19, 2024).

288. There are currently two pending OCR investigations involving ASU related to complaints filed against it regarding alleged Title IX violations.

289. For the past three years for which data is available, ASU's Tempe campus also has the highest rate of sexual misconduct incidents of all of ASU's campuses. See, https://cfo.asu.edu/campuscrime (last visited November 19, 2024).

290. In 2023, the most recent year for which data is available, there were 26 reported incidents of rape, 12 reported incidents of fondling, and 17 reported incidents of stalking. *Id*.

291. Based upon information and belief, the majority of individuals reporting incidents of sexual misconduct are female and the majority of accused individuals are male.

292. There were no unfounded crimes in 2023 meaning all reported incidents resulted in findings of responsibility, with those findings being made disproportionately against males. *Id*.

293. ASU students have long accused ASU of not doing enough when alleged incidents of sexual misconduct are reported. See, ASU Tempe campus has the highest rate of sex crimes of all its campuses - AZ Big Media (last visited November 19, 2024).

294. ASU has received ongoing pressure in the forms of protests, petitions, and the creation of independent organizations, such as Sun Devils Against Sexual Assault, advocating for ASU students and alumni who have allegedly been the victims of sexual assault.

See, https://www.statepress.com/article/2023/04/sun-devils-against-sexual-assault-april-2023-awareness-month (last visited November 19, 2024); https://www.azcentral.com/story/news/local/tempe-breaking/2022/04/29/protesters-at-asu-demand-more-resources-for-sexual-assault-survivors/9562889002/ (last visited November 19, 2024); https://www.statepress.com/article/2022/02/sun-devils-against-sexual-assault-protest (last visited November 19, 2024); https://www.abc15.com/news/region-southeast-valley/tempe/sexual-assault-survivor-group-says-arizona-state-university-needs-to-do-more (last visited November 19, 2024).

295. These protests have resulted in ASU frequently caving into pressure and meeting the demands requested by female alleged victims and survivors, such as moving the location of the victim advocates from the ASU Police Department to the Counseling Center, assisting with the creation of a Family Advocacy Center in Tempe, and creating a thorough list of resources.

296. Defendant Dr. Vogel was instrumental in instituting these changes to meet the demands of the female alleged victims and survivors further evidencing her conflict of interest and bias against John as a male respondent.

297. ASU has not taken similar supportive actions for male respondents.

298. There is no advocacy center for respondents at ASU or in Tempe, there is not a thorough list of resources for respondents, and there are no respondent advocates available at ASU.

**Internal Pressure on ASU by Jane and Jane's Advisor**

299. In 2023, Jane selected a nationally recognized victim's rights attorney previously known to ASU to serve as her advisor.

300. Jane's advisor's firm claimed it "zealously advances and enforces victims' rights in campus, criminal, and civil systems nationwide through survivor-focused and trauma-informed legal services."

301. In John's matter, Jane, by and through her advisor, made no less than four distinct threats to file complaints or pursue litigation against ASU if it did not meet her demands in the handling of her Title IX complaint.

302. Jane's advisor has previously filed at least one OCR complaint against ASU.

303. In 2020, Jane's advisor had filed at least one OCR complaint against ASU.

304. Jane's advisor had also filed at least one Clery Act complaint with the U.S. Department of Education against ASU.

305. Jane's advisor filed the Clery Act complaint against ASU for various alleged violations, including "failure to issue a timely warning about a sexual assault committed in a campus residence hall that may have posed a risk to other students and making sure there wasn't retaliation against a survivor when she sought [Jane's advisor] as her advisor."

306. In 2021, the U.S. Department of Education found that ASU was in "serious violations of the Clery Act," and "strongly recommended that ASU officials 're-examine the University's campus safety policies and procedures on a regular basis.'"

307. The U.S. Department of Education also asked ASU "to establish a more robust written rationale for the final determination of an alleged sexual assault investigation."

308. Following Jane's advisor's complaint against ASU, the Department of Education imposed additional pressure on ASU to afford more deference to female

complainants through an April 12, 2021 letter to ASU's general counsel. *See* Exhibit C, April 12, 2021 letter from James L. Moore III, Senior Advisor, Clery Act Compliance and Campus Safety Operations, U.S. Department of Education, to Ms. Sara Tower, ASU Associate General Counsel.

309. Into 2022, Equal Rights Advocates, an organization that describes itself as "fighting for women's equality," Jane's advisor's firm, Atlanta Women for Equality, California Women's Law Center, Champion Women, Clearinghouse on Women's Issues, and other organizations primarily focused on advocacy for women joined an open letter to Hon. Catherine E. Lhamon, Assistant Secretary for Civil Rights within the U.S. Department of Education, naming ASU as an example of an institution that fails to honor the rights of "student-survivors" and exerting additional pressure on ASU to favor female complainants and appear tough on male respondents in connection with its Title IX processes. *See* Exhibit D, June 2, 2022 Letter to Hon. Catherine E. Lhamon.

310. Jane's advisor had previously posted a "wall of shame" on her website where she named institutions, Title IX coordinators, and the names of respondents found responsible publicly on her website because she believes "educational institutions often hide this information to prevent the public from understanding the true risk of sexual and relationship violence on their campus."

311. At least one male respondent from ASU had been identified by name on Jane's advisor's website, which also named Defendant Preudhomme. *See* Exhibit E, Screen Capture of Jane's advisor's Former Website.

312. Based on Jane's advisor's history of interactions with ASU and Jane's constant pressure and threats of filing additional complaints against ASU on behalf of Jane in John's matter, ASU and Defendants feared rendering a final decision in John's favor, despite the evidence and credibility determinations demonstrating that no Title IX sexual harassment occurred.

313. ASU and Defendants feared that rendering a final decision in John's favor would cause further investigation by the U.S. Department of Education, and potentially a loss of federal financial assistance.

314. ASU and Defendants acquiesced to the demands of Jane and her advisor in order to avoid additional federal administrative complaints and potential litigation despite the fact that the evidence and credibility determinations demonstrated that no Title IX sexual harassment occurred.

315. ASU did not have the same fears with respect to John as its dealings with John's advisors had not yielded federal complaints or lawsuits.

## CLAIM ONE

### Violation of Title IX – 20 U.S.C. §§ 1681 *et seq.*

### (Against Defendant ABOR)

316. John restates and re-avers each and every preceding paragraph as if fully rewritten herein.

317. Title IX, 20 U.S.C. §§ 1681 *et seq.*, prohibits discrimination on the basis of sex in any education program or activity receiving federal financial assistance.

318. Discrimination under Title IX means differential treatment or less favorable treatment.

319. ASU is a public university that receives federal financial assistance and must comply with the requirements of Title IX.

320. Defendant ABOR administers federal financial assistance for ASU and must comply with the requirements of Title IX.

321. Defendant Ms. Jodi Preudhomme as the Title IX Coordinator is responsible for overseeing, coordinating, and implementing Title IX Policy and Procedures at ASU.

322. Title IX may be violated by an institution of higher education's imposition of discipline where gender and sex motivate the decision to discipline.

323. Under Title IX, ASU is also prohibited from providing a disciplinary process that is inadequate, unreliable, biased, and inequitable.

324. Defendant ABOR, by and through ASU, violated John's rights under Title IX by subjecting him to a flawed appeal process leading to an outcome that was based on his gender and sex that included Jane's Second Appeal which should not have been allowed at all.

325. Upon information and belief, ASU and Defendant ABOR failed to train Defendant Dr. Vogel on the components of an adequate, reliable, and impartial appellate review of a determination reached in a Title IX matter following a live hearing.

326. ASU and Defendant ABOR violated John's rights under Title IX by permitting Defendant Dr. Vogel, an individual with a known bias and conflict of interest against males, to serve as the Appeal Decision Maker.

327. ASU and Defendant ABOR discriminated against John based on his gender and sex when they permitted Defendant Dr. Vogel to change the decision following the live hearing from not responsible to responsible, impose the sanction of suspension, and inform him that he had no appeal process to challenge the decision.

328. ASU and Defendant ABOR discriminated against John based on his gender and sex when they permitted Defendant Dr. Vogel to adopt Jane's arguments regarding consent only being valid if verbalized with words and subsequently applied the wrong definition of consent to his matter.

329. Dr. Vogel provided no reasonable explanation for her refusal to accept Dr. Aska's determination that John was not responsible.

330. Upon Jane's Second Appeal, Defendant Dr. Vogel improperly conducted a rehearing of the evidence herself without remanding for rehearing pursuant to the Procedures.

331. Defendant Dr. Vogel wrongfully found that John committed Title IX sexual harassment because she was motivated by sex and gender bias against John as a male and a respondent.

332. Defendant Dr. Vogel's bias against John is demonstrated, at least, by the fact that there was no new or additional evidence supporting Dr. Vogel's decision overturning Dr. Aska's decision.

333. Jane was provided two opportunities to appeal, including an appeal of a decision issued by the Appeal Decision Maker, while John was denied an appeal under similar circumstances, demonstrating gender bias against John.

334. Jane, and similarly situated female complainants, are presumed by Defendant Dr. Vogel and ASU to be "victims" and "survivors."

335. Defendant Dr. Vogel provided no explanation for her rejection of Dr. Aska's credibility determinations despite Dr. Vogel never having observed or heard the testimony from John and Jane at the hearing.

336. Claims of sexual misconduct, more often than others, are decided solely or primarily based on the parties' credibility because sexual contact typically takes place in private.

337. Defendant Dr. Vogel's decision reflects her failure to consider the evidence that supported John and contradicted Jane's claims.

338. Dr. Aska, as the Hearing Officer, heard hours of testimony, questioned John and Jane, and issued a reasoned determination that John was not responsible for sexual misconduct.

339. By contrast to Dr. Aska, Defendant Dr. Vogel had only paper and a recording. Even if she reviewed the entire record, her ability to properly judge credibility would be greatly diminished.

340. Defendant Dr. Vogel reviewed Dr. Aska's determination without written input from John because he was never allowed to provide a written explanation about why Jane's First and Second Appeals should be denied.

341. Defendant Dr. Vogel's finding of responsibility on appeal can only be based on the unjustified and discriminatory decision to credit Jane's testimony, as the complaining female, over the testimony of John, the responding male. If Jane were not a female

complaining of sexual assault, her testimony would not have been credited over John's given the evidence corroborating John's testimony and the admissions made by Jane at the hearing.

342. Defendant Dr. Vogel's determination can only be explained by her anti-male bias.

343. Jane, and similarly situated female complainants, are presumed by ASU and Defendants ABOR, Dr. Vogel and Ms. Preudhomme to be "victims" and "survivors."

344. ASU and Defendant ABOR discriminated against John based on his gender and sex when they failed to pursue a sexual misconduct complaint against Jane and did not classify her complaint against John as retaliation for John seeking a no-contact directive and filing a complaint of harassment against Jane.

345. ASU and Defendant ABOR discriminated against John based on his gender and sex when they failed to take any disciplinary action against Jane related to the harassing conduct reported by John because ASU and Defendant ABOR favor females.

346. ASU and Defendant ABOR discriminated against John based on his gender and sex when they subjected him to an appeal process riddled with procedural irregularities that demonstrated sex and gender bias, including but not limited to allowing Jane two opportunities to appeal the same determination.

347. As a result of ASU's and Defendants' gender and sex bias against males involved in Title IX proceedings, John was erroneously found responsible for sexual misconduct that he did not commit.

348. ASU and Defendant ABOR have also been subjected to external and internal pressures to disproportionately punish male students accused of Title IX sexual harassment.

349. ASU has been the subject of numerous investigations resulting from complaints filed with OCR for alleged violations of Title IX and discrimination against female students.

350. ASU has been found responsible by the U.S. Department of Education for serious violations of the Clery Act.

351. ASU has been the subject of various complaints filed against it by Jane's advisor.

352. ASU and Defendant ABOR overcorrected in response to these and other pressures to disproportionately target male students accused of Title IX sexual harassment.

353. Upon information and belief, all students who have been suspended or expelled from ASU as a result of a Title IX process are male.

354. Upon information and belief, ASU's Title IX appellate procedures have a disparate impact on male students.

355. The totality of the circumstances establishes that ASU and Defendant ABOR have a pattern of inherent and systemic gender and sex bias resulting in discrimination against male students accused in Title IX matters.

356. As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

**CLAIM TWO**

**Violation of 42 U.S.C. § 1983, Violation of the Due Process and Equal Protection Clauses of the U.S. Constitution**

**(Against Defendants Dr. Vogel and Ms. Preudhomme in their individual and official capacities.)**

357. John restates and re-avers each and every preceding paragraph as if fully rewritten herein.

358. Defendants' deprivation of John's rights, including John's rights under Title IX, give rise to a claim against officials in their individual and official capacities for violations of 42 U.S.C. § 1983.

359. The Fourteenth Amendment and Fifth Amendment to the U.S. Constitution provide that no state shall "deprive any person of life, liberty, or property, without due process of law."

360. The Fourteenth Amendment also prohibits a state from denying any person equal protection of the law.

361. 42 U.S.C. § 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress…

362. At all times relevant to John's Complaint, ASU was a state actor.

363. At all times relevant to John's Complaint, Defendant ABOR was a state actor.

364. At all times relevant to John's Complaint, Defendants Dr. Vogel and Ms. Preudhomme were acting under the color of Arizona state law.

365. John was admitted to ASU, accepted the offer of admission, gave up other offers of admission, paid all tuition and fees owed, and completed coursework while complying with Defendant ABOR and ASU's Student Code of Conduct, Policy, and Procedures.

366. John has the right to due process and equal protection in disciplinary proceedings that can result in the denial or delay of his ability to complete his education at ASU, and to avoid arbitrary and capricious conduct that would deprive him of or delay his education at ASU.

367. John has a significant liberty and property interest in avoiding an unfair and erroneous disciplinary decision, maintaining his academic and personal reputation, and avoiding social stigma.

368. John has a protected property interest in pursuing his education of which he cannot be deprived without due process.

369. John has a protected liberty interest in his good name, reputation, honor, and integrity which he cannot be deprived of without due process.

370. John had a constitutionally protected property interest in continuing his education at ASU.

371. John was entitled to process commensurate with the seriousness of the allegations and potential discipline, sanctions, and repercussions he was facing.

372. The allegations in this case have resulted in one of the harshest sanctions available at ASU, have lifelong ramifications for John, and are quasi-criminal in nature.

373. Defendants' actions violated John's constitutionally protected property interest in his continued enrollment at ASU and his right to complete his degree at ASU.

374. John's constitutionally protected property interest in his right to continued enrollment at ASU also arises from the policies, courses of conduct, and practices established by Defendant ABOR and ASU.

375. John has a constitutional right to be free from arbitrary exclusion or restrictions on his ability to enter ASU's campus.

376. John's constitutionally protected property interest further arises from the express and implied contractual relationship between John and ASU.

377. Defendants Dr. Vogel and Ms. Preudhomme improperly employed the Policy and Procedures and did not provide mechanisms to ensure John received fair and appropriate due process.

378. Defendants Dr. Vogel's and Ms. Preudhomme's actions in suspending John violated his substantive and procedural due process rights under the U.S. Constitution.

379. Defendants Dr. Vogel and Ms. Preudhomme acted intentionally recklessly, willfully, or with callous and deliberate indifference in depriving John of his constitutionally protected liberty and property interests in his education and reputation when they suspended him from ASU.

380. Dr. Aska, after hearing testimony from John and Jane at a live hearing, correctly determined that John was not responsible for Title IX sexual harassment.

381. Defendant Dr. Vogel, intent on showing ASU protects the rights of female complainants that she views as victims or survivors and to the detriment of male respondents, reversed Dr. Aska's finding without justification or cause.

382. Sex and gender improperly played a role in Defendant Dr. Vogel's decision.

383. John had the right to have his Title IX matter decided by an unbiased decision-maker as part of his right to due process and pursuant to the Procedures.

384. Defendants effectively deprived John of access to his education without due process because he was foreclosed from appealing Defendant Dr. Vogel's decision.

385. Defendant Dr. Vogel intended to harm John and acted intentionally recklessly, willfully, or with callous and deliberate indifference in depriving John of his constitutionally protected property interest in his education, right to access ASU, and reputation when she changed Dr. Aska's determination, issued a suspension as a sanction, and informed John there was no appeal process available to him although Jane was provided an opportunity for appeal under similar circumstances.

386. Defendant Dr. Vogel intended to harm John and acted intentionally recklessly, willfully, or with callous and deliberate indifference in depriving John of his constitutionally protected property interest in his education, right to access ASU, and reputation when she ignored the definition of consent contained in the Procedures and found that consent could only be established by words.

387. Defendants ABOR and Ms. Preudhomme intended to harm John and acted intentionally recklessly, willfully, or with callous and deliberate indifference in depriving John of his constitutionally protected property and liberty interest in his education, right to access ASU, and reputation by permitting Defendant Dr. Vogel to serve as the Appeal Decision Maker when she has a history of conflict of interest and bias against males.

388. Defendant Dr. Vogel violated Defendant ABOR's Policy and Procedures and violated John's substantive and procedural due process rights under the U.S. Constitution because no due process was provided to John.

389. Defendants Dr. Vogel and Ms. Preudhomme violated John's substantive and procedural due process rights under the U.S Constitution because John could not respond to Jane's First and Second Appeals.

390. The discipline imposed by Defendants has permanently damaged John's academic and personal reputation and denied him the benefits of an education at his chosen university.

391. Defendants agreed to, approved, and ratified this unconstitutional conduct.

392. Defendants had a custom and practice of disregarding and violating students' constitutional rights in evaluating and determining appeals, which resulted in the absolute failure to afford basic due process protections to male students accused of sexual misconduct.

393. Defendants acted under the color of state law when they showed intentional, outrageous, and reckless disregard for John's constitutional rights.

394. As a result, Dr. Vogel and Ms. Preudhomme failed to provide John with the basic due process and equal protections they are required to provide to a student in a Title IX matter at a public university.

395. Defendants Dr. Vogel and Ms. Preudhomme were acting under color of state law when they showed intentional, outrageous, and reckless disregard for John's constitutional rights.

396. As a direct and proximate result of the above conduct, John sustained tremendous damages, including, without limitation, damages to reputation, psychological damages, loss of educational and career opportunities, economic injuries, and other direct and consequential damages; as such, John is entitled to injunctive relief as outlined herein.

## CLAIM THREE

**Breach of Contract**

**(Against Defendant ABOR)**

397. John restates and re-avers each and every preceding paragraph as if fully rewritten herein.

398. The relationship between a university and its students is contractual and includes the university's policies relating to disciplinary proceedings, including the Defendant ABOR and ASU's Policy and Procedures.

399. At all times relevant hereto, a contractual relationship existed between Defendant ABOR, by and through ASU, and John through ASU's Policy and Procedures.

400. ASU was required to act in accordance with the Policy and Procedures in adjudicating reports of alleged sexual misconduct.

401. ASU has materially breached its contracts with John by failing to comply with its obligations, standards, Policy, and Procedures in the course of the appeal process related to Jane's formal Title IX complaint, and by subjecting John to an arbitrary and capricious appeal proceeding not afforded by the Policy and Procedures.

402. ASU offered enrollment to John, and he accepted that offer and paid ASU tuition.

403. John enrolled at ASU with the understanding and reasonable expectation that ASU would enforce the provisions of its Policy and Procedures.

404. An express and/or implied contract under Arizona law was created when John accepted an offer of admission to ASU and paid the tuition and fees.

405. John satisfied all of the obligations required by ASU to remain in good standing, and he enrolled at ASU with the understanding and reasonable expectation that ASU would act fairly, impartially, and abide by the terms of Defendant ABOR and ASU's Policy and Procedures.

406. John satisfied all of the obligations required by ASU to remain in good standing, and he enrolled at ASU with the understanding and reasonable expectation that ASU would fulfill its contractual obligations to him and that he would continue his enrollment at ASU until his graduation.

407. ASU and Defendant ABOR breached the contract with John when they permitted sex and gender bias to be the motivating factor in Defendant Dr. Vogel's findings of responsibility and sanctions against John.

408. ASU and Defendant ABOR breached the contract with John when they permitted Defendant Dr. Vogel to redefine the meaning of consent to recognize only verbal consent as being valid in contravention of the Policy and Procedures.

409. ASU and Defendant ABOR breached the contract with John when they allowed Jane a Second Appeal in contravention of the Policy and Procedures.

410. ASU and Defendant ABOR breached the contract with John when they allowed Defendant Dr. Vogel to remand Dr. Aska's initial determination based on a lack of credibility determinations, which was not an element required by or outlined for inclusion in a written determination by the Policy and Procedures.

411. ASU and Defendant ABOR breached the contract with John when they permitted Defendant Dr. Vogel to change Dr. Aska's finding regarding responsibility without justification or cause and failed to provide John with an opportunity to appeal, which was inconsistent with John's reasonable expectations under his contract with ASU.

412. Defendant ABOR's material breaches of the contract with John subjected him to a blatantly arbitrary and capricious appeal process.

413. As a direct, proximate and foreseeable consequence of ASU's numerous breaches, John's academic and career prospects, earning potential, and reputation have been severely harmed.

414. John has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

415. As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## CLAIM FOUR

**Breach of the Covenant of Good Faith and Fair Dealing**

**(Against Defendant ABOR)**

416. John restates and re-avers each and every preceding paragraph as if fully rewritten herein.

417. Every contract in Arizona contains the implied covenant of good faith and fair dealing which obligates a party to the contract to not do anything which would deny the other party to the contract of the other party's reasonably anticipated or expected benefits under the contract.

418. John had a reasonable expectation under his contracts with ASU that he would be able to participate in and be provided with an appeal process involving an impartial decision-maker and one that would follow the appeal procedures outlined in this Complaint.

419. John had a reasonable expectation under his contracts with ASU that he would be able to respond to Jane's First and Second Appeals in writing.

420. John had a reasonable expectation under his contracts with ASU that he would be able to object to Defendant Dr. Vogel serving as the Appeal Decision Maker in both Jane's First and Second Appeals.

421. John had a reasonable expectation under his contracts with ASU that he would be given a meaningful opportunity to be heard before any finding of responsibility was made against him and a sanction imposed.

422. Based on the foregoing facts, Defendant ABOR breached and violated the covenant of good faith and fair dealing implied in ASU's contracts with John by, *inter alia*, requiring John to endure an appeal process not afforded by the Policy and Procedures, failing to provide John with an appeal process involving an impartial decision-maker, and instead subjecting him to an appeal process driven by sex and gender bias, and that had a predetermined outcome in violation of the Policy and Procedures.

423. These actions have denied John his reasonably expected benefits from his contracts with ASU.

424. As a direct, proximate, and foreseeable consequence of these breaches, John's academic and career prospects, earning potential, and reputation have been severely harmed.

425. John has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

426. As a result of the foregoing, John is entitled to recover damages in an amount to be determined at a trial, plus prejudgment interest and attorneys' fees and costs.

## CLAIM FIVE

### Intentional Infliction of Emotional Distress

### (Against Defendant ABOR)

427. John restates and re-avers each and every preceding paragraph as if fully rewritten herein. John restates and re-avers each and every preceding paragraph as if fully rewritten herein.

428. The actions of ASU and Defendant ABOR were willful and intentional.

429. ASU and Defendant ABOR knew or should have known that its actions in finding John responsible for sexual misconduct based on Jane's frivolous and false complaint, in conducting a fundamentally flawed appeal process, and in sanctioning John by effectively labeling him as a predatory sexual offender would cause John severe emotional distress.

430. ASU and Defendant ABOR had a previous history with Jane's advisor and knew that they risked further stigmatization of John if he was found responsible by Jane's advisor posting John's name on her "wall of shame" as she had done in the past in another ASU case.

431. ASU and Defendant ABOR's conduct was extreme, outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

432. ASU and Defendant ABOR's conduct was the direct and proximate cause of John's severe emotional distress.

433. John is deeply depressed and anxious, has trouble sleeping, and has developed physical maladies as a result of ASU and Defendant ABOR's conduct.

434. As a direct, proximate, and foreseeable consequence of ASU and Defendant ABOR's aforementioned conduct, John's academic and career prospects, earning potential, and reputation have been severely damaged.

435. John has sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

436. As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, John respectfully requests that this Court grant him the following relief:

A. Issue a declaration that ASU's Title IX appeal process was unlawful as applied to John;

B. Enter permanent injunctive relief that vacates the decision of ASU to suspend John and that removes from his academic record all references to the decision and any other related sanctions or disciplinary actions;

C. Award compensatory and punitive damages in an amount to be determined at trial;

D. Award court costs and other reasonable expenses incurred in maintaining this action, including attorney fees under A.R.S. § 12-341 and any other applicable authority; and

E. Award such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff respectfully demands a trial by jury pursuant to Fed. R. Civ. P. 39.

Respectfully submitted this 20th day of November, 2024.

By s/ *Anna E. Bullock*

Susan C. Stone*
Kristina W. Supler*
Dayna M. Hloska*
Anna E. Bullock*
KOHRMAN JACKSON & KRANTZ, LLP
1375 E. 9th Street, 29th Floor
Cleveland, OH 44114
P: (216) 696-8700
F: (216) 621-6536
E: scs@kjk.com; kws@kjk.com; dmh@kjk.com; aeb@kjk.com
**Pro hac vice*

Joshua M. Ernst
Ernst, Brown & Draper, PLLC
1930 S. Alma School Road, Suite A200
Mesa, AZ 85210
JErnst@ebdlawyers.com

*Counsel for Plaintiff John Doe*

## CERTIFICATE OF SERVICE

I certify that on November 20, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant(s):

Kristin L. Windtberg
James D. Smith
Sarah P. Lawson
Osborn Maledon, P.A.
kwindtberg@omlaw.com
jsmith@omlaw.com
slawson@omlaw.com

*Counsel for Defendants*